**United States District Court**
For the Northern District of California

1
2
3
4
5
6                          UNITED STATES DISTRICT COURT

7                        NORTHERN DISTRICT OF CALIFORNIA

8
9    KRISTY LINKENHOKER

10           Plaintiff,                      No. C-06-05432-EDL

11       v.                                  **ORDER DENYING IN PART AND
                                             GRANTING IN PART DEFENDANTS'**
12                                           **MOTION FOR SUMMARY JUDGMENT**

13   WARREN E. RUPF, SHERIFF,
     CONTRA COSTA COUNTY,
14   MICHAEL COSTA

15           Defendants.
16   _____/

17   **I.    INTRODUCTION**

18           Plaintiff Kristy Linkenhoker ("Plaintiff") filed this action on September 5, 2006.  Plaintiff

19   was employed as a Deputy Sheriff in Contra Costa County from 2002 to August 2005.  She asserts

20   claims for sexual harassment and retaliation against Defendants Michael Costa ("Costa"), Sheriff

21   Rupf ("Rupf"), and the County of Contra Costa ("County") (collectively, "Defendants").  In her

22   First Amended Complaint ("FAC"), Plaintiff alleged seven causes of action.  On February 1, 2007,

23   the Court dismissed the First, Fifth, Sixth, and Seventh causes of action with leave to amend to

24   allege exhaustion of administrative remedies.  Plaintiff did not amend her complaint.  Accordingly,

25   the following causes of action remain: (1) Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-

26   3(a) (Second Cause of Action against Defendants Rupf and County); (2) Sexual Harassment in

27   Violation of California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a),

28   (j)(1) and (k) (Third Cause of Action against all Defendants); and (3) Retaliation in Violation of

     FEHA, Cal. Gov't Code § 12940(h) (Fourth Cause of Action against all Defendants).

**United States District Court**
For the Northern District of California

1    Defendants now move for summary judgment as to all of Plaintiff's remaining claims.

2  Alternatively, Defendants move for an order adjudicating some of the claims in the complaint.

3  Defendants' motion came on for hearing on November 20, 2007.  Having read all the papers

4  submitted and carefully considered the relevant legal authority, the Court hereby DENIES in part

5  and GRANTS in part Defendants' motion for the following reasons and for the reasons stated at the

6  hearing.

7  **II.    FACTS**

8    Plaintiff was hired by the County as a deputy sheriff recruit around July 2002 and was

9  employed at the County for three years.  From May 2003 until her termination on August 1, 2005,

10  she was assigned to the West County Detention Facility ("WCDF").  Narayan Decl., Ex. 1 at 57-60

11  ("Pl. Depo.").  Plaintiff received high ratings in her regular performance appraisals and received

12  several special commendations.  Pl. Decl. ¶ 2; Pl. Depo, Ex. C.

13    On February 4, 2004, Sergeant Costa was assigned to investigate Deputy McClung's

14  allegations that Plaintiff falsely told other deputies that he was assisting drug dealers smuggle drugs

15  into the facility.  Pl. Depo. at 64-66.  Costa found that Plaintiff made false or unsubstantiated

16  allegations about McClung and failed to maintain a professional bearing.  Costa Decl. ¶ 2.  Plaintiff

17  was disciplined with corrective counseling on May 17, 2004, and she believed that the investigation

18  was fair.  Pl. Depo. at 66-68.

19    A.    Hostile Work Environment

20    Plaintiff alleges that Sergeant Costa sexually harassed her after that investigation concluded.

21  Pl. Depo. at 69.  Specifically, on June 4, 2004, Plaintiff was working with Sgt. Costa, Sgt. Gomez,

22  and Deputy Hiatt, when Sgt. Costa blew in Plaintiff's ear and moved in a circular grinding motion

23  behind her for about 8-10 seconds.  Id. at 77, 79-83 ("I felt pressure on my back"; "He started

24  grinding on my back, and I moved forward further.  And then he moved forward and more or less

25  forced me into the desk, where I couldn't get away.  So, I started shutting down my computer

26  screens and had to literally like squeeze to my left to get away from him.").  She believes that she

27  felt Costa's stomach on her body.  After this happened, Plaintiff started dry heaving and the incident

28  made her want to throw up.  Id. at 77, 82.  Costa then asked her where she was going.  Id. at 78.

2

United States District Court

For the Northern District of California

1   When Chaplain Susan Choi then entered the room, Costa yelled at her using expletives.  Id. at 78-79.

2   Two days later, Costa verbally harassed Plaintiff by divulging personal identifying information

3   about her in front of inmates, such as the type of car she drove and her city of residence.  Id. at 92-

4   94.  Plaintiff felt that he deliberately did this to let her know that he had control over her.  Id. at 98.

5   After these incidents, Plaintiff testified that she felt sick to her stomach for a while, could not sleep,

6   and was crying, upset, and mad.  Pl. Depo. at 209.   Costa denies these incidents.  On August 7,

7   2004, Plaintiff signed an evaluation stating that she did not wish to report being the victim of or

8   witness of any sexual harassment incident, and had knowledge of the Departmental Harassment

9   Policy.  See Narayan Decl., Ex. 2 (Pl. Response to RFA No. 20).

10       Plaintiff stated she was afraid to report Costa's conduct at first.  Pl. Dep. at 84, 99.  She

11   testified, however, that around July 2004, she mentioned the incident to Sgt. Simmons, but he did

12   not take any responsive action.  In October, she mentioned the harassment to Sgt. Nugent, who did

13   nothing in response to her complaints.  Id. at 110-11, 121-22, 125.

14       Plaintiff told Deputies Ashton and Julie Raner that Costa rubbed up against her.  Ashton

15   believes that she then told Plaintiff about a sexual comment that Costa made to her about the

16   problem with women being not being able to tell when they are done and that she may have told her

17   about another comment he made about certain female deputies needing to get married and pregnant.

18   Ashton states that she may have told Plaintiff that Costa constantly sat right next to her during

19   meetings, even when other seats were empty, and Plaintiff states that Ashton did tell her this.  See

20   O'Dell Decl., Ex. D at 11-15; Narayan Decl.,  Ex. 9 at 4.  According to Plaintiff, Deputy Nathan

21   Dennison also told Plaintiff sometime in 2005 that Costa touched his wife's, Deputy Jacqueline

22   Dennison, buttocks, although both Dennisons deny this.  Pl. Depo. at 70; Jacqueline Dennison Decl.

23   ¶¶ 2-3; Nathan Dennison Depo. at 26.

24       According to Plaintiff, at a sexual harassment training in November 2004, Sgt. Poplin

25   pointed to a grenade with a pin in with a number one label on it and joked that "anybody who wants

26   to make a complaint [of] sexual harassment . . . can take a number."  Pl. Depo. at 158.  After the

27   training, Plaintiff told Sgt. Simmons she wanted to report the sexual harassment incident, wrote a

28   synopsis of what happened, and gave it to Sgt. Simmons.  Narayan Decl., Ex. 9 at 4-5.  Plaintiff also

3

1   heard Sgt. Poplin talk about "blow jobs" and remark that women should be at home barefoot and

2   pregnant in the kitchen, and should not be in law enforcement.  Id. at 155.

3          B.      Initial Discipline of Plaintiff Regarding Assault on Inmate Pinmetal

4          On August 10, 2004, Plaintiff was investigated for failure to take any action to protect inmate

5   Pimental when she was battered by other inmates.  Sergeant Nugent investigated the incident.  In her

6   original August 10, 2004 statement, Plaintiff reported that approximately six different inmates at

7   different times told her "they wanted inmate Pimental off the building."  She was unable to identify

8   their names.  She told them to write classification and declare Pimental as their enemy.  She then

9   informed Deputy Parilla of the information she received.  Deputy McCormack approached her and

10  told her to write an information only report.  Williams Decl., Ex. 2.  McCormack reported that

11  Plaintiff told him that inmates said they were going to kill Pimental, that she refused to identify the

12  inmates, and that he told her to write an incident report, but she refused.  Parilla reported that

13  Plaintiff told her that Pimental was back and that five or six inmates already wanted to kill Pimental.

14  See Williams Decl. ¶¶ 9-10.

15         Plaintiff was issued a Phase I corrective counseling memorandum on November 6, 2004 for a

16  violation of Custody Services Bureau Policy 16.01 for failing to take action knowing an inmate's

17  safety was in jeopardy.  Pl. Depo, Ex. 1.  Deputies McCormack and Parilla were issued personnel

18  reports.  Williams Decl, Exs. 1, 3.

19         C.      Report and Investigation of Sexual Harassment

20         On November 11, 2004, Plaintiff filed a written report regarding Costa's alleged harassment.

21  Narrayan Decl., Ex. 2 (Response to RFA No. 3).  Sergeant Simmons then counseled Plaintiff on her

22  rights to raise harassment issues and drafted a memorandum to Lieutenant Lemay advising him of

23  what Plaintiff reported.  Simmons Decl., Ex. 1.  On December 1, 2004, Internal Affairs commenced

24  an investigation conducted by Sergeants Warren and Williams.  Warren Decl. ¶¶ 4, 5.  Sergeant

25  Costa denied that the June 4 or 6 incidents took place.  Deputy Hiatt and Sergeant Gomez who were

26  nearby at the time of the incident stated that they did not see anything.  In March 2005, Internal

27  Affairs recommended a finding of not sustained as to the allegations, which was approved by the

28  chain of command.  Warren Decl. ¶¶ 6, 9, 10, 12.  Costa was not disciplined , and he retired in

4

**United States District Court**
For the Northern District of California

1   January 2005.  Sergeant Warren made a finding of sustained as to the allegation of inappropriate

2   comments by Costa towards female deputies.  See Internal Affairs ("IA") Report at CC-623

3   (submitted under seal).

4        In her investigation, Sergeant Warren conducted numerous interviews, collecting numerous

5   statements, including Deputy Raner's statement that Plaintiff had told her that Costa brushed up

6   against her; Deputy Ashton's statements that Costa made her uncomfortable when he always sat next

7   to her, that he made several inappropriate sexual comments and derogatory comments about women,

8   and that Plaintiff told her that Costa had rubbed up against her; Deputy Langford's statement that

9   Costa's sitting next to Ashton was very noticeable to everyone, especially since there were so many

10  extra seats, and that Costa made frequent inappropriate comments to her to the effect that if she had

11  a man in her life, she would not generate so much paperwork, and that women should get married

12  and have children; and former Deputy Tramontini's statement in which she recalled Costa, Sergeant

13  Gomez, and Sergeant Bryan making inappropriate statements regarding "blow jobs" in front of

14  inmates and female officers, and that Sergeants Bryan and Poplin treated female deputies differently

15  from male deputies.  See IA Report (submitted under seal).   Deputies Kim, Carson, Langford and

16  Sale all remembered Costa's inappropriate statements and remembered the specific statement he

17  made to Ashton, regarding the problem with women being that you could never tell when they were

18  done.  Carson reported that McClung, a former employee, was bothered by Costa's comments.

19  Townsend recalled Plaintiff telling him that Costa stood too close to her once.  Langford reported

20  that Dennison told her that she had been bothered by Costa's inappropriate remarks, but Dennison

21  said she did not experience any such problems with Costa directly, but had told McClung and

22  Langford to report Costa's statements to them that they believed were inappropriate.  By contrast,

23  Costa told the investigating team that he did not consciously or intentionally make any offensive

24  statements.  Id.  Costa denied making the "blow job" statement, and Warren acknowledged that

25  Costa's account differed from that of Tramontini and Langford, who stated that Gomez and Costa

26  made these comments where inmates and deputies could overhear them.  Warren Depo. at 29.

27  Gomez stated he could not recall any conversation with Costa in which the comments were

28  inappropriate.  See Lemay Decl., Ex. 1.

5

**United States District Court**
For the Northern District of California

1    Regarding Costa's use of expletives around Chaplain Susan, the Chaplain did not hear Costa

2   make any appropriate statements to her, Sergeant Gomez did not recall the statement, Costa denied

3   making such a statement, but Deputy Hiatt recalled Costa making a statement similar to what

4   Plaintiff alleged.  While Gomez stated only that he did not recall the use of expletives, Sergeant

5   Warren equated this lack of recollection with a denial in her conclusions in the IA report.  See IA

6   Report at CC 622-623.

7    Warren never considered making an untruthfulness allegation against Costa or broadening

8   the investigation to include Gomez or Poplin.  See Warren Depo. at 24.

9    D.    Follow up Pimental Investigation and Alleged Retaliation

10    After December 9, 2004, while reviewing Plaintiff's corrective phase I counseling action

11   regarding inmate Pimental, Captain Pascoe identified discrepancies in the documents, and referred

12   the case to Internal Affairs.  Pascoe Decl. ¶¶ 3-5.  By then, Captain Pascoe knew of Plaintiff's sexual

13   harassment complaint, having learned of it only a few weeks earlier in mid-November.  O'Dell

14   Decl., Ex. F at 70-71.  The subjects of the Internal Affairs investigation were Plaintiff, Deputy

15   McComrack, and Deputy Parilla, who were also involved in the Pimental incident.  Suppl. Williams

16   Decl. ¶ 3.

17    On February 4, 2005, Plaintiff told Internal Affairs that: (1) Deputy Parilla gave her the

18   information regarding Pimental; (2) the inmates merely asked her if there was a snitch on the

19   building, and she told them she was not aware of one; (3) she told Deputy McCormack that inmates

20   approached her and asked her about a snitch, that she offered to write an incident report and

21   McCormack told her not to; (4) she told McCormack she was unable to identify the inmates who

22   asked her about a snitch; and (5) Plaintiff told Parilla about the snitch comment, and Parrilla told her

23   that Pimental was going to get beaten up.  Williams Decl. ¶ 11.  Plaintiff's second statement differed

24   from her original statement that she gave on the day of the incident that the inmates told her about

25   Pimental.  Internal Affairs interviewed Plaintiff again on February 15, 2005.  Williams told her the

26   purpose of the interview was to clarify inconsistencies that led him to believe she was untruthful.

27   Plaintiff minimized those inconsistencies by answering, "probably, I don't know" and "anything is

28   possible, do I recall it, no."  Williams Decl. ¶ 13.  McCormack and Parilla gave statements to

1   Internal Affairs in January 2005 that were consistent with their earlier statements.  Williams Decl. ¶¶

2   9, 10 & Ex. 3.

3          Because Plaintiff's account of the events during her February 4, 2005 interview changed to

4   blame McCormack and Parrilla, on February 8, 2005, Internal Affairs issued a notice of

5   administrative inquiry to plaintiff advising her of untruthfulness.  Williams Decl. ¶ 12, Ex. 5.  In

6   March 2005, Internal Affairs recommended sustaining allegations of untruthfulness and procedure

7   (inmate rights) against Plaintiff, and these recommendations were approved.  The inmate rights

8   allegation against McCormack was sustained and his personnel action was elevated to Phase I, and

9   the allegation against Parilla was dismissed as unfounded.  Suppl. Williams Decl. ¶ 4.

10         Plaintiff claims that after she complained about Costa's harassment, she was shunned by

11  virtually all of the sergeants from November 2004 through January 2005, and they ignored her and

12  gave her dirty looks.  She also received less desirable work assignments (in building 8 where the

13  work is harder).  Pl. Decl. ¶¶ 3-4.

14         E.      Termination

15         On August 1, 2005, after holding a roundtable meeting to discuss Plaintiff's termination, the

16  Sheriff issued an order and notice terminating Plaintiff's employment, which charged Plaintiff with

17  failure to take necessary actions to protect an inmate and failure to respond truthfully during the

18  Internal Affairs investigation.  Narayan Decl., Ex. 5.   On December 8, 2005, Plaintiff filed a charge

19  of discrimination with the EEOC.  Narayan Decl., Ex. 6.  After an arbitration in January 2006, the

20  arbitrator found that the County had just cause to terminate Plaintiff.  Flanagan Decl., Ex. 1.

21  **III.    ANALYSIS**

22         A.      Legal Standard

23         Summary judgment shall be granted if "the pleadings, depositions, answers to

24  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

25  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

26  law."  FRCP 56(c).  Material facts are those which may affect the outcome of the case.  See

27  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

28  genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

United States District Court

For the Northern District of California

1  party. Id. "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some

2  significant probative evidence tending to support the complaint." Smolen v. Deloitte, Haskins &

3  Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must not weigh the

4  evidence or determine the truth of the matter, but only determine whether there is a genuine issue for

5  trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  The court must view the facts in

6  the light most favorable to the non-moving party and give it the benefit of all reasonable inferences

7  to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

8  (1986).

9        A party seeking summary judgment bears the initial burden of informing the court of the

10  basis for its motion, and of identifying those portions of the pleadings and discovery responses that

11  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

12  323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

13  demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

14  where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

15  merely by pointing out to the district court that there is an absence of evidence to support the

16  nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party must

17  then set forth specific facts showing that there is some genuine issue for trial in order to defeat the

18  motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

19        B.      Motion for Summary Judgment

20              1.      Jurisdiction to Hear Plaintiff's Sexual Harassment Claim

21        Defendants first argue that the Court lacks jurisdiction to hear Plaintiff's FEHA claim for

22  sexual harassment.  In order to bring a civil suit alleging a FEHA violation, a plaintiff must first file

23  an administrative claim with the California Department of Fair Housing ("DFEH") within one year

24  from the date upon which the alleged unlawful practice occurred.  Cal. Govt. Code § 12960(d).

25  Because the alleged harassment by Sergeant Costa took place in June 2004, and Plaintiff filed her

26  charge with the EEOC on December 8, 2005, Defendants argue that Plaintiff cannot pursue her

27  FEHA claim because her administrative complaint was untimely.

28

**United States District Court**
For the Northern District of California

1    The California Supreme Court, however, applies the continuing violation doctrine to a

2   retaliatory course of conduct "for actions that take place outside the limitations period if these

3   actions are sufficiently linked to unlawful conduct that occurred within the limitations period."

4   Yanowitz v. L'Oreal USA, 36 Cal. 4th 1028, 1056-58 (2005).  Under California law, a continuing

5   violation exists where the employer's unlawful actions are: (1) sufficiently similar in kind; (2) have

6   occurred with reasonable frequency; and (3) have not acquired a degree of permanence.  Richards v.

7   CH2M Hill, Inc., 26 Cal. 4th 798, 823 (2001) (holding that when employer unlawfully refuses

8   reasonable accommodation of disabled employee or engages in disability harassment, statute of

9   limitations begins to run either when course of conduct is brought to end or when employee is on

10  notice that further efforts to end unlawful conduct will be in vain).  See also Valdez v. City of Los

11  Angeles, 231 Cal. App. 3d 1043, 1052 (1991) (maintenance of discriminatory promotional system

12  within one year preceding appellant's filing his claim made the claim timely).

13    Specifically, in Richards, the court noted that in the disability context, once an employer

14  "makes clear in word and deed that the employee's attempted further reasonable accommodation is

15  futile, then the employee is on notice that litigation, not informal conciliation, is the only alternative

16  for the vindication of his or her rights.  Barring a constructive discharge, it is at that point the statute

17  of limitations for the violation begins to run."  26 Cal. 4th at 823.  See also Cucuzza v. City of Santa

18  Clara, 104 Cal. App. 4th 1031, 1043 (Cal. Ct. App. 2002).

19    In the present case, Plaintiff was on notice that further efforts to end the harassment would be

20  in vain as of March 2005, when Internal Affairs recommended a finding of not sustained as to her

21  sexual harassment allegations, which was approved by the chain of command.  Warren Decl. ¶¶ 6, 9,

22  10, 12.  Prior to that point, Plaintiff testified that Costa harassed her physically and verbally in June

23  2004, that Deputy Ashton told her about inappropriate comments Costa made to her in November

24  2004, that she heard Sergeant Poplin make derogatory comments about women and sexual

25  comments  prior to November 11, 2004, and that Sergeant Poplin made the comment about the

26  grenade in November 2004 when she officially filed her complaint.  There is also evidence in the

27  record that Plaintiff told two supervisors about Costa's alleged harassment in July and in October

28  2004.  Therefore, while the facts are disputed, viewing the facts in the light most favorable to

**United States District Court**

For the Northern District of California

1   Plaintiff, the statute of limitations did not begin to run until March 2005 when the Internal Affairs'

2   harassment investigation concluded.

3          In addition, Plaintiff argues that the reopening of the investigation into her role in the

4   Pimental incident and her termination constituted retaliatory conduct that "grew out of" the unlawful

5   harassment.  See Birschtein v. New United Motor Manufacturing, 92 Cal. App. 4th 994 (2001) (if

6   retaliatory acts "grew out of . . . the antecedent unlawful harassment," then retaliatory acts were

7   sufficiently allied with preceding harassment to constitute continuing course of unlawful conduct;

8   dispute of material fact raised where plaintiff's complaints about initial sexual harassment resulted

9   in defendant's retaliatory acts of staring campaign).  While Defendants are correct that in Birschtein,

10  the retaliation was more closely related to the harassment and the offensive acts occurred with

11  greater frequency, here, summary judgment is also improper in light of Plaintiff's allegations of

12  retaliatory conduct, her alleged attempts to resolve the harassment informally through her employer,

13  and the other facts discussed above, considering the totality of the circumstances.

14          2.        Merits of Sexual Harassment Claim

15          Defendants also argue that the sexual harassment claim should be dismissed because Plaintiff

16  cannot establish a prima facie case of either quid pro quo sexual harassment or hostile work

17  environment.  At the hearing, Plaintiff confirmed that she is only pursuing a hostile work

18  environment claim, not a quid pro quo claim.

19          To assert a Title VII claim based on a hostile work environment, a claimant must allege a

20  "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment."

21  Burrell v. Star Nursery, Inc., 170 F.3d 951, 954 (9th Cir. 1999).  California courts look to federal

22  law on Title VII discrimination claims to interpret analogous provisions of FEHA.  Mixon v. Fair

23  Employment and Housing Comm'n., 192 Cal. App. 3d 1306, 1316-17 (1987).  "In order to prevail

24  on her hostile work environment claim, [plaintiff] must show that her 'workplace [was] permeated

25  with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the

26  conditions of [her] employment and create an abusive working environment.'"  "The working

27  environment must both subjectively and objectively be perceived as abusive."  Brooks v. City of San

28  Mateo, 229 F.3d 917, 924 (9th Cir. 2000) (citations omitted).  The Ninth Circuit uses  a "totality of

United States District Court

For the Northern District of California

1    the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of

2    hostile work environment," considering factors such as "frequency, severity and level of interference

3    with work performance."  "When assessing the objective portion of a plaintiff's claim, [the court]

4    assume[s] the perspective of the reasonable victim."  Id. (citations omitted).

5          In determining what constitutes sufficiently pervasive harassment, courts have held that acts

6    of harassment cannot be occasional, isolated, sporadic, or trivial.  Rather, the plaintiff must show a

7    concerted pattern of harassment of a repeated, routine or a generalized nature.  In addition, while an

8    employee "need not prove tangible job detriment to establish a sexual harassment claim, the absence

9    of such detriment requires a commensurately higher showing that the sexually harassing conduct

10   was pervasive and destructive of the working environment."  Fisher v. San Pedro Peninsula Hosp.,

11   214 Cal. App. 3d 590, 610 (1989).

12         As for the admissibility of evidence of harassment of other female employees in the

13   workplace, while "evidence of the general work atmosphere, involving employees other than the

14   plaintiff, is relevant to the issue of whether there existed an atmosphere of hostile work

15   environment," "one who is not personally subjected to such remarks or touchings must establish that

16   she personally witnessed the harassing conduct and that it was in her immediate work environment."

17   Fisher, 214 Cal. App. 3d at 611.  "If . . . the plaintiff neither witnesses the other incidents nor knows

18   that they occurred, those incidents cannot affect his or her perception of the hostility of the work

19   environment.  The objective severity of harassment must be judged from the perspective of a

20   reasonable person in the plaintiff's position. . . . A reasonable person would not perceive a work

21   environment to be objectively hostile or abusive based on conduct toward others of which she is

22   unaware."  Beyda v. City of L.A., 65 Cal. App. 4th 511, 519 (1998).  A plaintiff, therefore, must

23   witness the conduct against others, or otherwise be aware of it for that conduct to alter the conditions

24   of her employment and create an abusive working environment, although the plaintiff need not

25   personally witness every act relied upon.  Id.

26         Preliminarily, Defendants' objections to the evidence of harassment of which Plaintiff was

27   not aware during the relevant time period are sustained insofar as the evidence is offered as proof of

28   a sexually hostile work environment.  Beyda, 65 Cal. App. 4th at 519.  However, to the extent that

United States District Court

For the Northern District of California

1    Plaintiff relies on this evidence in support of her retaliation claim as evidence of pretext (to compare

2    how Defendants treated Costa's untruthfulness as opposed to her untruthfulness as discussed below),

3    such evidence is relevant.  In addition, Costa's comments to other women who worked with Plaintiff

4    of which Plaintiff was aware are relevant.  Id.  Here, Plaintiff claims that: (1) Deputy Ashton told

5    her about Costa's sexist comments and that he always sat next to her during line-up; and (2) Deputy

6    Nathan Dennison told her that Costa touched Deputy Jackie Dennison's buttocks.  Such evidence is

7    subject to the limits of the hearsay rule.  Id. at 521.  Because Ashton confirmed that she told or

8    possibly told Plaintiff these things, her comments are admissible to show Plaintiff's knowledge and

9    state of mind and to prove a hostile work environment.  Because the Dennisons denied that such

10   things ever happened, Plaintiff's hearsay is inadmissible.

11                a)      Defendant Costa

12        Defendants, relying on Brooks v. City of San Mateo, 229 F.3d 917, 927 (9th Cir. 2000),

13   argue that Plaintiff alleges only one offensive advance from Costa, which does not rise to a level of

14   severity or establish pervasiveness or frequency sufficient to establish a hostile work environment.

15   In Brooks, the court held that the offensive sexual assault by a coworker, who fondled the plaintiff,

16   was "an entirely isolated incident.  It had no precursors and was never repeated."  The court found

17   the conduct highly offensive, but reasoned that the plaintiff "was harassed on a single occasion for a

18   matter of minutes in a way that did not impair her ability to do her job in the long-term, especially

19   given that the city took prompt steps to remove [the offender] from the workplace."  229 F.3d at

20   926.  The court also considered that the plaintiff had not alleged that she sought or required

21   hospitalization or suffered any physical injuries.  Id.  The court refrained from deciding whether a

22   single incident could ever be sufficient to establish a hostile work environment claim, but noted that

23   "an isolated incident of harassment by a *co-worker* will rarely (if ever) give rise to a reasonable fear

24   that sexual harassment has become a permanent feature of the employment relationship."  Id. at 924

25   (emphasis added).

26        Brooks is distinguishable in several significant ways, however, from the present case.  First,

27   Brooks involved a mere co-worker, not a supervisor, like Costa was.  See id. at 927, n.9 ("a sexual

28   assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the

**United States District Court**
For the Northern District of California

1   conditions of employment and give rise to a hostile work environment claim"). Second, Costa's

2   divulging personal information about Plaintiff in front of inmates a few days later, given the

3   arguably dangerous jail environment, could be found by a jury to be a "continuous manifestation of

4   sex-based animus." Birschtein, 92 Cal. App. 4th at 1002. Third, unlike the plaintiff in Brooks,

5   Plaintiff alleges that she was aware that Costa had sexually harassed other women and reported this

6   to Internal Affairs. Specifically, Deputy Ashton told her that Costa had made sexist comments to

7   Ashton and that he always sat next to her in meetings, no matter how many chairs were available.

8   O'Dell Decl., Ex. D at 11-15; Narayan Decl., Ex. 9 at 4. As noted above, these statements are

9   admissible to show Plaintiffs' state of mind. Finally, Costa was not immediately investigated,

10  removed or disciplined as was the offending co-worker in Brooks, although Costa retired in January

11  2005.

12       Defendants' reliance on Ellison v. Brady, 924 F.2d 827 (9th Cir. 1991) is also misplaced. In

13  Ellison, the plaintiff received a bizarre note from the defendant after he had asked her out several

14  times, and plaintiff asked a co-worker to tell defendant to leave her alone. Despite her request,

15  defendant sent her a long, passionate, disturbing letter. He told her he had been watching and

16  experiencing her; he made repeated references to sex; he said he would write again. The court held

17  that: "A reasonable woman could consider Gray's conduct, as alleged by Ellison, sufficiently severe

18  and pervasive to alter a condition of employment and create an abusive working environment." Id.

19  at 878-80 (noting that the required showing of severity or seriousness of the harassing conduct

20  varies inversely with the pervasiveness or frequency of the conduct, and that while a single act can

21  be enough, repeated incidents create a stronger claim). Plaintiff's case is not necessarily weaker

22  than Ellison's case because Costa was one of her supervisors, not a mere co-worker, and he engaged

23  in physical touching.

24       Finally, Defendants rely on Herberg v. California Institute of Arts, 101 Cal. App. 4th 142

25  (2002), in which the court affirmed summary judgment in favor of the school where plaintiff, an

26  employee of art school, was depicted in sexual and vulgar manner in painting displayed in the

27  gallery for 24 hours. Herberg is distinguishable in that "the context in which the alleged harassment

28  took place" was an art school which had a non-censorship policy, and it was "reasonable to expect

that exhibitions of student artwork would . . . include sexually explicit material." Id. at 154 n.12.  In addition, while the court noted that  "a single incident [of sexual harassment] must be severe in the extreme and generally must include either physical violence or the threat thereof [to establish liability for harassment]," here, an aspect of violence or threat could be found in Costa's divulging personal information about Plaintiff to inmates, especially in the context of working in a jail.  Id. at 151.  It is therefore not accurate to characterize this as a single incident case, when viewing the facts in a light most favorable to Plaintiff:  Costa, one of her supervisors,  grinded up against her for 8-10 seconds with his stomach touching her, Costa divulged personal information about her two days later in front of inmates, and Plaintiff had knowledge of his making sexist remarks to Ashton and constantly sitting next to her in a suspicious way.  In light of these disputed facts, summary judgment for Costa is improper.

b)      Defendants Rupf and County

"[U]nder the FEHA, an employer is strictly liable for all acts of sexual harassment by a supervisor. But strict liability is not absolute liability in the sense that it precludes all defenses." State Dept. of Health Services v. Superior Court, 31 Cal. 4th 1026, 1042 (2003).  In addition, "[once an employer knows or should know of harassment, a remedial obligation kicks in. . . . That obligation will not be discharged until . . . prompt, effective action . . . has been taken."  Fuller v. City of Oakland, 47 F.3d 1522, 1528 (9th Cir. 1995).

Briefly, because summary judgment is not warranted as to Costa, it is improper as to the County Defendants.  Plaintiffs' claim against these Defendants is based on Costa's conduct and, in addition, Sergeant Poplin's comment made while pointing to a grenade that "anyone who wants to make a sexual harassment complaint, take a number."  Defendants argue that because no other deputies either recalled the comment as Plaintiff did or thought it was offensive, there is no dispute of fact as to whether the comment was objectively offensive.  However, the Court must assume that for the purpose of this motion, that the comment was as Plaintiff alleges.  This comment subjectively offended Plaintiff and could be objectively offensive.  In sum, there are material facts in dispute regarding Plaintiff's harassment claims against all Defendants, and summary judgment is improper.

3.      Retaliation Claim

**United States District Court**

For the Northern District of California

1   The elements of a prima facie retaliation claim are:  (1) plaintiff undertook a protected

2   activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link

3   exists between the two events.  See Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir.

4   2004) (Title VII); Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005) (FEHA).

5   Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the

6   plaintiff engaged in protected activities and the proximity in time between the protected action and

7   the allegedly retaliatory employment decision."  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.

8   1987).  See also Flait v. No. American Watch Corp., 3 Cal. App.4th 467, 478 (1992) (reversing

9   judgment for employer on motion for summary adjudication where circumstantial evidence of causal

10   link raised issue of fact).

11   Once plaintiff produces evidence supporting a prima facie case, the burden shifts to the

12   defendant employer to articulate a legitimate, non-retaliatory reason for the adverse employment

13   action.  Once the employer articulates such a reason, a plaintiff bears the burden of demonstrating

14   that the reason was merely a pretext for the unlawful retaliatory motive.  Stegall v. Citadel Broad.

15   Co., 350 F.3d 1061, 1066 (9th Cir. 2003); Yanowitz, 36 Cal. 4th at 1042.  A plaintiff can prove

16   pretext with either direct or indirect evidence.  If a plaintiff offers direct evidence of discriminatory

17   motive, a triable issue as to the actual motivation of the employer is created even if the evidence is

18   not substantial.  When direct evidence is unavailable, however, and the plaintiff proffers only

19   circumstantial evidence that the employer's motives were different from its stated motives, specific

20   and substantial evidence of pretext is required to survive summary judgment.  Stegall v. Citadel

21   Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003) (citing Godwin v. Hunt Wesson, Inc., 150 F.3d

22   1217, 1221 (9th Cir. 1998)).[1]

23   a)   Defendant Costa

24   ————————————

25   [1]   Stegall noted that the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S.

26   90 (2003), may undermine Godwin to the extent it implies that direct evidence is more probative than circumstantial evidence, but upheld Godwin to the extent that plaintiff still needed to proffer specific and substantial evidence of pretext to overcome the summary judgment motion.  350 F.3d at 1066.  See

27   also Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1031 (9th Cir. 2006) ("Although there may be some tension . . . on this point -- several of our cases decided after Costa repeat the Godwin

28   requirement that a plaintiff's circumstantial evidence of pretext must be 'specific' and 'substantial'").

United States District Court

For the Northern District of California

1    Plaintiff alleges that Costa retaliated against her by mentioning her vehicle type and her city

2  of residence in front of inmates after she refused to acquiesce to his sexual conduct.  Under FEHA, a

3  statutorily protected activity refers either to (1) making a charge, testifying, assisting or participating

4  in proceedings or hearings under the statutes, or (2) opposing acts made unlawful by statutes.  Cal.

5  Gov't Code § 12940(h).  Refusal of sexual advances is insufficient to constitute protected action, at

6  least in a Title VII action.  See Del Castillo v. Pathmark Stores, 941 F. Supp. 437, 438-39 (S.D.N.Y.

7  1996) ("[E]ven the broadest interpretation of a retaliation claim cannot encompass instances where

8  the alleged 'protected activity' consists simply of declining a harasser's sexual advances, which is

9  all that is alleged here by way of 'protected activity.'  If it were otherwise, every harassment claim

10  would automatically state a retaliation claim as well.").  In the FEHA context, courts have noted that

11  "[a]lthough an employee need not formally file a charge in order to qualify as being engaged in

12  protected opposing activity, such activity must oppose activity the employee reasonably believes

13  constitutes unlawful discrimination, and complaints about personal grievances or vague or

14  conclusory remarks that fail to put an employer on notice as to what conduct it should investigate

15  will not suffice to establish protected conduct."  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028,

16  1047 (2005).

17    In the present case, Plaintiff did not talk to Costa about the incident, rather, she merely

18  walked away from him after the incident, and believes she said "don't" or something to that effect.

19  Therefore, Plaintiff cannot show she engaged in a statutorily protected activity as to Costa, as she

20  did not communicate her "reasonable concerns that the employer has acted or is acting in an

21  unlawful discriminatory manner" in June 2004.  Summary adjudication is proper as to Plaintiff's

22  claim for retaliation against Defendant Costa.

23    b)    Defendants Rupf and County

24    "If the employer presents admissible evidence either that one or more of plaintiff's prima

25  facie elements is lacking, or that the adverse employment action was based on legitimate,

26  nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff

27  produces admissible evidence which raises a triable issue of fact material to the defendant's

28  showing."  Caldwell v. Paramount Unified Sch. Dist., 41 Cal. App. 4th 189, 203 (1995).  Here,

United States District Court

For the Northern District of California

1   Defendants offered significant evidence that Plaintiff's termination was based on her handling of the

2   Pimental incident and her subsequent untruthfulness during the course of that investigation.

3         The most serious employment action taken against Plaintiff is her termination, which is an

4   actionable adverse employment action.[2]  Defendants argue Plaintiff failed to demonstrate the causal

5   connection element in her prima facie case, and that even if she alleged prima facie retaliation, the

6   follow-up investigation of the Pimental battery and her ultimate termination resulted from

7   legitimate, non-retaliatory reasons.  Plaintiff argues that the timing of the events and the

8   unprecedented nature of reopening an investigation of an officer show both causality and pretext.

9   Plaintiff also offers evidence that Defendants investigated her untruthfulness with much greater zeal

10  than they investigated evidence of Costa's and Gomez's untruthfulness when looking into Plaintiff's

11  harassment allegations.

12        As for the timing, Plaintiff alleges that she reported the harassment officially on November

13  11, 2004, and the follow-up Pimental investigation was referred to internal affairs on December 9,

14  2004.  Defendants made findings in March 2005 not sustaining a finding of harassment by Costa and

15  sustaining findings of Plaintiff's untruthfulness and inmate rights procedural violations.  This one

16  month gap is sufficient to establish a prima facie case.  But timing alone is usually insufficient to

17  refute the government's legitimate, proffered reason for the adverse action.  See Hashimoto v.

18  ───────────────────

19        [2]     Plaintiff also argues that other adverse employment actions included shunning and
    receiving less desirable work assignments.  However, as for Plaintiff's claim that certain sergeants
20  ignored her and gave her dirty looks or became distant and mean after she alleged harassment, Plaintiff
    does not describe any specific conduct or incidents, and even if she did, shunning does not constitute
21  an adverse employment action.  See, e.g., Manatt v. Bank of Am., 339 F.3d 792, 803 (9th Cir. 2003)
    ("mere ostracism [by supervisor] in the workplace is not grounds for a retaliation claim"); Bergin v. N.
22  Clackamas Sch. Dist., 2005 U.S. Dist. LEXIS 42252, *41-43 (D. Or. 2005).  As for the less desirable
    work assignments, Plaintiff's evidence is too weak to constitute an adverse employment action for
23  summary judgment purposes.  Plaintiff declares that she was almost always assigned to Building 8
    (which was a more difficult work assignment) from November 2004 through January 2005.  Pl. Decl.
24  However, during her deposition, she could not say when she was assigned more frequently to Building
    8, and she did not tell her supervisors Sergeants Bryan and Kroll that she "wanted something done about
25  it right now," but rather merely told them that she was getting burned out working in Building 8.  She
    does not recall when she told them this.  Pl. Depo. at 128-30.  There are not enough specifics about
26  timing (or those sergeants' knowledge of her reporting harassment) or indeed about any significant
    disadvantage to Building 8 to raise a question of fact whether Plaintiff's assignment to Building 8 was
27  an adverse action or, even if it was, if it was causally related to her reporting harassment.  See Kennedy
    v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996) (where deposition testimony was uncorroborated
28  and self-serving and contradicted the deponent's prior statements and medical evidence, court found
    insufficient disagreement to require submission to jury).

United States District Court

For the Northern District of California

1    Dalton, 118 F.3d 671, 680 (9th Cir. 1997) (where adverse employment actions occurred within a few

2    months of plaintiff's reporting, court noted that  "[a]lthough the timing of these events suffices to

3    establish a minimal prima facie case of retaliation, it does nothing to refute the government's

4    proferred legitimate reasons for disciplining [plaintiff]" and held that plaintiff "failed to carry her

5    burden of establishing a triable issue of fact on the ultimate question of whether the government

6    retaliated against her").  If, however, the evidence as a whole shows that defendants' actions may

7    not have been taken for their proffered reasons, summary judgment is inappropriate.  See Passantino

8    v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 507 (9th Cir. 2000) ("Moreover, we have

9    held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of

10   alternative reasons proffered by the defendant. . . . While [defendant] correctly notes that there was

11   some evidence at trial that the alteration in job responsibilities and the obstruction of information

12   may not have been due to retaliatory motives, the evidence as a whole does not compel this

13   conclusion.") (citing Strother v. Southern Cal. Permanente Medical Group, 79 F.3d 859, 870 (9th

14   Cir. 1996)[3]); Flait v. North American Watch Corp., 3 Cal. App. 4th 467, 479 (1992) (where four

15   months elapsed between plaintiff's complaints and termination, court noted that pretext may be

16   "inferred from the timing of the company's termination decision, by the identity of the person

17   making the decision, and by the terminated employee's job performance before termination";

18   finding found holes in defendants' evidence regarding its legitimate proffered reason for termination

19   and holding that "viewing the evidence in the light most favorable to Flait, a reasonable trier of fact

20   could conclude that [defendant's] articulated reasons for terminating Flait's employment are not

21   worthy of credence").

22

23   _____

24        [3]     In Strother, the defendant did not "specifically provide legitimate explanations for
     treatment that support[ed] Strother's retaliation claim, focusing instead on providing explanations for

25   its actions which formed the basis of Strother's FEHA discrimination claim."  But accepting that
     evidence as evidence regarding retaliation, the court found a material dispute of fact as to pretext

26   (defendant offered evidence that its decisions were made in part because of plaintiff's poor interpersonal
     skills), relying on letters regarding plaintiff's ability to get along well with people at work along with

27   the temporal proximity of the adverse employment action to plaintiff's complaint.  In Strother, the
     plaintiff was removed from her position the day after she filed her first complaint, and other acts of

28   retaliation occurred within months afterward.  79 F.3d at 870.

**United States District Court**
For the Northern District of California

1    Here, Plaintiff presents relatively strong evidence based on timing, as the investigation

2  regarding her failure to protect the inmate Pimental was reopened only approximately one month

3  after she reported Costa's harassment.  Defendants, however, have offered very strong evidence that

4  Plaintiff's termination was based on legitimate, nondiscriminatory factors – namely, that Plaintiff

5  lied about her role in the endangerment of inmate Pimental when defendants reopened that

6  investigation.  Defendants' evidence of a legitimate proffered reason is much stronger than

7  defendants' evidence in <u>Flait v. North American Watch Corp</u>., 3 Cal. App. 4th 467, 479 (1992).

8  However, although the question is a close one, on balance, Plaintiff has pointed to just enough

9  evidence of pretext in the form of the timing, circumstances of the reopening of the investigation,

10  and disparate treatment to survive summary judgment.

11    As to the actual reopening of the investigation, Captain Pascoe states that on December 9,

12  2004, while reviewing Plaintiff's corrective Phase I counseling action regarding inmate Pimental, he

13  identified discrepancies in the documents, and referred the case to Internal Affairs.  Pascoe Decl. ¶¶

14  3-5.  By then, he knew of Plaintiff's harassment complaint.  Plaintiff's account of the events

15  regarding the Pimental incident certainly differed from the accounts of Deputies McCormack and

16  Padilla.  However, a jury could infer that this reopening of the investigation was unusual.  First,

17  while Captain Pascoe declared that "it is not uncommon for me to request further investigation after

18  considering an investigation for recommendation for placement in the corrective counseling

19  system," when questioned in his deposition, he could recall no instances "where a phase one came

20  up to [him] and then later subsequent to that there was an internal affairs investigation done with

21  respect to the events covered by that phase one."  Supp. Pascoe Decl. ¶ 6; Supp. O'Dell Decl., Ex. F

22  (Pascoe Depo.) at 45.  Therefore, there is a dispute as to whether such follow-up investigations are

23  unusual.  In addition, while the investigation was reopened and Parilla, McCormack, and Plaintiff

24  were all re-interviewed, Captain Pascoe's memorandum poses questions mostly focused on Plaintiff,

25  and this took place before Plaintiff gave her later contradictory statements.  Narrayan Decl., Ex. 4.

26  Thus, taken as a whole, a jury could infer that the follow-up investigation, even if warranted by

27  discrepancies in the parties' reports, was somewhat out of the ordinary.

28

Second, as to the investigation of Plaintiff's untruthfulness and as to the resulting termination, while the Court certainly does not condone Plaintiff's lack of candor, her evidence that allegations of Costa's and Gomez's untruthfulness were not followed up with the same zeal constitutes indirect evidence of pretext.  In particular, Defendants never considered making an untruthfulness allegation against Costa nor broadening the investigation to include Gomez or Poplin, much less did they discipline any of these male officers, despite the facts that: (1) while Costa denied using an expletive in front of the Chaplain and two allegedly nearby persons did not recall the statement, Plaintiff and Deputy Hiatt recalled it, and Internal Affairs ultimately found inappropriate conduct; (2) Costa denied consciously or intentionally making offensive statements to female deputies, but six deputies reported that he did make inappropriate statements to female deputies; and (3) multiple deputies reported that Costa and Gomez made inappropriate sexual comments in their presence, but Costa denied making such comments and Gomez could not recall such comments.  While Costa did soon retire, limiting defendants' ability to take corrective action against him, there was no investigation into his untruthfulness, nor was there any investigation into Gomez's untruthfulness, who remained on the job.  Taking the evidence in a light most favorable to Plaintiff, there is evidence that her untruthfulness was treated more harshly than the untruthfulness of Costa and Gomez.[4]  While the Court is troubled by the fact that Plaintiff's termination seemed justified and that, in some sense, the issue boils down to whether an arguably unfair targeting of Plaintiff in the reopening of the investigation gave her the opportunity to lie, Plaintiff's lying resulted in a more thorough investigation and a harsher punishment for her than for Costa.

In sum, the degree of heightened zeal regarding Plaintiff's untruthfulness coupled with the closeness of timing is sufficient, although hardly overwhelming, to create a triable issue of fact as to pretext.  The Court, however, cautions Plaintiff that her case appears weak given the evidence in the

---

[4]     Plaintiff was also punished more harshly than were Parilla and McCormack, but she was the only one of the three for whom allegations of untruthfulness were sustained, and indeed, they did not contradict their own earlier statements as Plaintiff did her own.  In addition, while Plaintiff previously was found to be untruthful in making allegations about McClung, Defendants do not point to anything in the record to show that they relied on this previous finding when terminating Plaintiff, and there are also other facts in the record as to Plaintiff's good past performance history.

1 record that she was terminated because of the Pimental incident[5] and her untruthfulness regarding

2 the same.  However, this claim is not suitable for summary judgment given the disputed issues of

3 fact discussed above.  Cf. Yartzoff v. Thomas, 809 F.2d 1371, 1377 (9th Cir. 1987) (citations

4 omitted) ("a grant of summary judgment, though appropriate when evidence of discriminatory intent

5 is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a

6 prima facie case because of the 'elusive factual question' of intentional discrimination").

7 **IV.    CONCLUSION**

8        For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED in part

9 and GRANTED in part.  The retaliation claim against Costa is dismissed.  Defendants' evidentiary

10 objections are SUSTAINED in part and OVERRULED in part.

11

12 Dated: November 30, 2007

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26        [5]        Indeed, the arbitrator found that Plaintiff was terminated for just cause.  While the
arbitrator's decision is reasonably thorough, the arbitrator did not consider any of Plaintiff's arguments
27 related to retaliation or discrepancies in the treatment of different officers' untruthfulness.  While the
decision is entitled to some weight and may be admitted into evidence, see Alexander v. Gardner-
28 Denver Co., 415 U.S. 36, 56-58 (1974), its findings are not dispositive here, because the arbitrator did
not consider all of the evidence before this Court.